**EFiled: Oct 20 2014 02:12PM EDT**
**Transaction ID 56218350**
**Case No. 9006-VCN**

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

October 20, 2014

Eric M. Andersen, Esquire
Mark Andersen, P.A.
3513 Concord Pike, Suite 3300
Wilmington, DE 19803

David L. Finger, Esquire
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange Street, 7th Floor
Wilmington, DE 19801

> Re: *Willis v. PCA Pain Center of Virginia, Inc.*
> C.A. No. 9006-VCN
> Date Submitted: June 23, 2014

Dear Counsel:

Defendants PCA Pain Center of Virginia, Inc. ("PCA") and Konrad H. Kaeding ("Kaeding," and with PCA, the "Defendants") have moved to dismiss or stay Pamela Willis ("Willis") and Physicians Interventional Pain Center, LLC's ("PIPC," and with Willis, the "Plaintiffs") complaint (the "Complaint").[1] Through the Complaint, Plaintiffs seek redress for Defendants' alleged failure to proceed with agreements intended to transfer PCA's business to the Plaintiffs. Defendants argue that the Court lacks subject matter jurisdiction over what are essentially

---

[1] PCA is a Virginia corporation, and PIPC is a Delaware limited liability company.

breach of contract claims and, regardless of jurisdiction, the Court should stay the action pending resolution of an action in Virginia filed less than one week before the Complaint.

## I. BACKGROUND[2]

PCA is a pain clinic franchise located in Blacksburg, Virginia. PCA focuses on diagnosing and managing chronic pain. The company was formed on September 21, 2011 with Kaeding as its sole stockholder. Kaeding managed PCA as an absentee owner through 2012, while also employing a full-time practice manager. By 2012, the pain clinic's business was struggling and Kaeding consulted with Willis regarding the company's financial situation. Following their discussions, which continued through the summer and fall of 2012, Willis reviewed PCA's records and contracts and eventually travelled to Blacksburg to inspect the business first hand.

---

[2] This factual summary is based on the well-pleaded allegations in the Complaint.

On December 6, PCA held a board meeting, with Kaeding and Willis as the two attendees. PCA retained Willis as a consultant in exchange for a percentage of the business's profit and a right to purchase assets or equity of PCA. At the December 6 meeting, PCA further resolved to engage Willis as a practice manager to replace the then current manager who had allegedly engaged in unethical business practices.

The day after the board meeting, Willis and Kaeding traveled to Virginia to meet with PCA's staff and transition Willis into her new position. From then until March 2013, Willis managed PCA, improving its financial condition. She ran the day-to-day operations, supervised staff, paid bills, kept the books, and marketed the business. Because of her success, Willis and Kaeding discussed how she would be compensated for her work. These discussions allegedly included the negotiation of a sale of PCA's assets to Willis.

On February 1, in contemplation of the asset sale, Willis signed PIPC's Certificate of Formation and mailed it to the Delaware Secretary of State. On the same day, PCA held a board meeting in part to authorize the sale of PCA's assets to PIPC (the "Asset Sale"). On February 5, PIPC's Certificate of Formation was

filed by the Secretary of State and PCA passed a corporate resolution confirming the Asset Sale and a winding down of PCA's business.

The terms of the sale included (i) PCA retaining a right to use its assets while still in operation and (ii) PIPC agreeing to lease a space in Ridley Township, Pennsylvania in a building owned by a limited liability company owned by Kaeding. PIPC would also take over PCA's Blacksburg operations.

By the end of the month, Willis had opened bank accounts for PIPC, and in March, she began the credentialing process to move providers from PCA to PIPC. She also signed a lease on PIPC's behalf for the Pennsylvania property referenced in PCA's February 5 board resolution. Willis continued to manage PCA and prepare for the transfer of business to PIPC until 2013. She discovered unbilled work of approximately $200,000 and attempted to collect that debt. PCA's business continued to improve and become profitable.

In July 2013, Kaeding began to interfere with Willis's operation of PCA. He allegedly made ill-advised promises to staff, interacted with employees managed by Willis without her knowledge, and decided that a biller was to deal solely with him, despite his lack of knowledge regarding the billing operation. Kaeding

supposedly slandered Willis and undermined her authority. Then, in late August, Kaeding traveled to Virginia to take authority away from Willis more completely. In September, he locked Willis out of the clinic and attempted to halt the transfer of PCA's business to PIPC by shredding electronic fund transfer agreements and diverting money into PCA's accounts.

Kaeding continued his course of conduct into October by canceling Willis's PCA credit card, closing a joint account at Bank of America, and locking Willis out of company software, bank accounts, insurance carrier accounts, and the company's on-site mailbox. On October 1, 2013, Kaeding filed a certificate of amendment for PIPC with the Delaware Secretary of State claiming that he was the sole owner of PIPC and that Willis had formed PIPC as his personal assistant.

## II. CURRENT PROCEEDINGS

Plaintiffs brought this action on October 11, 2013, shortly after Defendants sued Willis in Virginia.[3]

---

[3] Kaeding Aff. Ex. B. While the Complaint is dated October 11, 2013, it was not e-filed until October 16, 2013.

Plaintiffs assert claims of fraud, equitable fraud, negligent misrepresentation, breach of contract, conversion, and unjust enrichment. They request an order requiring Defendants to complete the Asset Sale and seek damages for conversion and breach of contract, and against Kaeding for fraud. To remedy their equitable fraud and unjust enrichment claims, Plaintiffs request an equitable accounting and a constructive trust on fifty percent of PCA's profits from December 2012 to present. They also seek an equitable accounting and a constructive trust on all revenue belonging to PIPC from October 1, 2013 to present.

Defendants argue that the Court lacks subject matter jurisdiction over these claims, alleging that Plaintiffs have pleaded neither an equitable cause of action nor a basis for equitable relief. They further contend that Plaintiffs' non-contract claims should be dismissed as duplicative of the contract claims. Even if the Court has subject matter jurisdiction over Plaintiffs' claims, the Defendants assert that the action should be stayed pending resolution of ongoing proceedings in Virginia.

### III.  SUBJECT MATTER JURISDICTION

As a court of equity with limited subject matter jurisdiction, this Court has the power to hear cases involving (i) the assertion of an equitable right, (ii) the

request for an equitable remedy, or (iii) a claim subject to a statutory grant of jurisdiction. The "clean-up" doctrine allows the Court to hear claims involving legal rights and remedies, but only if some other part of the case provides a basis for equitable jurisdiction.

Plaintiffs invoke three separate theories of equitable relief and plead one equitable cause of action. The equitable relief sought includes (i) specific performance of the Asset Sale, (ii) an equitable accounting, and (iii) the imposition of constructive trusts on PCA's profits from December 2012 to present and revenue belonging to PIPC from October 1, 2013 onward. The equitable right asserted is the allegation of equitable fraud. While the Court has the inherent power to hear claims invoking equitable rights, a request for an equitable remedy only serves as a basis for the Court's jurisdiction if a legal remedy cannot sufficiently compensate the Plaintiffs.

A. *Specific Performance*

Plaintiffs seek an award of specific performance to compel Defendants to complete the Asset Sale, as approved by PCA's February 5, 2013 board resolution. That resolution "approve[d] the sale of all assets of [PCA] to [PIPC]" as part of

PCA's process of "wind[ing] down its affairs and ceas[ing] operations in the most economically efficient manner possible."[4]  Plaintiffs request an order compelling Defendants to transfer PCA's assets to remedy PCA's breach of its alleged promise to sell them.  The relevant question is whether an equitable remedy may be necessary to redress Plaintiffs' alleged injuries.

Specific performance for the transfer of property "is an extraordinary remedy predicated upon the exercise of equitable discretion, and the Court will not award it lightly."[5]  "[T]o establish jurisdiction in the Court of Chancery in the first instance . . . it is necessary for the plaintiff to demonstrate that the remedy at law is inadequate."[6]  Personal property is not generally considered unique and in cases dealing with such property, the Court usually assumes that damages are an

---

[4] Compl. Ex. C.
[5] *CC Fin. LLC v. Wireless Props., LLC*, 2012 WL 4862337, at *8 (Del. Ch. Oct. 1, 2012) (citations omitted).
[6] Donald J. Wolfe, Jr. & Michael A. Pittenger ("Wolfe & Pittenger"), *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 12.03[b][2], at 12-41 (2013).

adequate award for an aggrieved party since property of equal kind and quality can typically be purchased in the market.[7]

While Plaintiffs bear the burden of establishing the Court's equitable subject matter jurisdiction, the issue "is determined from the face of the complaint as of the time it was filed, with all material factual allegations assumed to be true."[8] The Court looks beyond the language of the Complaint to determine the actual substance and nature of the relief Plaintiffs seek.[9]

Plaintiffs' arguments for specific performance essentially rest on three theories: (i) PCA's assets are unique, (ii) the Defendants' insolvency makes a legal remedy impractical, and (iii) the nature of the legal remedy would be speculative and difficult to determine. The second and third arguments do not support the Court's jurisdiction in this case.

Although the Court "may consider insolvency as a factor in determining equitable jurisdiction," a plaintiff bears the burden of alleging "particular details as

---

[7] *Id.* at § 2.03[b][2], at 2-67.
[8] *Prestancia Mgmt. Gp., Inc. v. Va. Heritage Found.*, 2005 WL 1364616, at *3 (Del. Ch. May 27, 2005) (quoting *Block Fin. Corp. v. Inisoft Corp.*, 2003 WL 136182, at *2 n.4 (Del. Ch. Jan. 7, 2003)).
[9] *Id.*

to the financial strength" of a defendant.[10]  Plaintiffs have not put forward any details of Defendants' financial positions.  The fact that Defendants have argued that proceeding with litigation simultaneously in Delaware and Virginia would be financially burdensome does not establish that Defendants are insolvent or incapable of satisfying a money judgment.

There is also no support in the Complaint for the assertion that, absent a finding that PCA's assets are unique, a legal remedy would be impracticable or speculative.  In certain circumstances, the Court possesses equitable jurisdiction when a legal remedy would almost certainly be incomplete due to the full scope of a plaintiff's damages being not readily quantifiable.[11]  However, "it must appear from the face of the complaint that a trier of fact would be unable to quantify damages."[12]  The Complaint fails to indicate why damages could not be calculated for what seems to fundamentally be a breach of contract case.  Although Plaintiffs argue that the pro forma projections that PCA's franchisor provided PCA were

---

[10] *Hillsboro Energy, LLC v. Secure Energy, Inc.*, 2008 WL 4561227, at *3 (Del. Ch. May 27, 2005).

[11] Wolfe & Pittenger, § 2.03[b][2], at 2-65-66.

[12] *Id.* (citing *Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 79 (Del. Ch. 1991)).

"incompetent and misleading," it is not clear why a third party would not be able to adequately value a pain center franchise. Since Plaintiffs have provided no support beyond conclusory statements as to why a standard damages award would be impracticable or speculative, that argument, standing alone, fails to provide the Court with equitable jurisdiction.

However, the Court may exercise equitable jurisdiction when a plaintiff requests specific performance and the subject matter of the action is unique. In such a case, damages at law are presumptively insufficient. Plaintiffs seem to believe that the Court has subject matter jurisdiction to specially enforce all business combinations, and since an asset sale can be one form of business combination, the Court has jurisdiction to enforce the Asset Sale. However, as the Court has made clear, the "fundamental question" in whether specific performance to enforce a business combination is appropriate is: "is this a truly unique opportunity that cannot be adequately monetized."[13]

---

[13] *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 82 (Del. Ch. 2001).

The essential question in establishing the Court's jurisdiction based on a request for an equitable remedy is always whether there is a "complete, practical and efficient" remedy at law.[14] The Complaint is mostly devoid of allegations that damages would not be an adequate remedy or that PCA's assets are unique. However, when determining whether equitable jurisdiction exists, the Court views the allegations in the Complaint "in light of what [Plaintiffs] really seek[] to gain by bringing [their] cause of action."[15] If the Court determines that the assets are "unique, rare, incapable of being reproduced, or of some special value to the owner that defies pecuniary estimate or valuation, equity may intervene . . . ."[16] Moreover, personal property may be deemed unique when one cannot purchase replacements in the market of equal kind and quality.[17]

Although the Court is largely uninformed of the nature of PCA's assets, there are facts suggesting that Plaintiffs seek property that cannot be obtained in the market. The Complaint alleges that Willis worked hard to turn PCA around

---

[14] *Int'l Bus. Machs.*, 602 A.2d at 78.

[15] *Reeves v. Transp. Data Commc'ns, Inc.*, 318 A.2d 147, 149 (Del. Ch. 1974).

[16] Wolfe & Pittenger, § 2.03[b][2], at 2-66 (citing 4 J. POMEROY, A TREATISE ON EQUITY JURISPRUDENCE § 1402 (5th ed. 1941)).

[17] *Id.* at 2-67.

from a failing business to a profitable one. She presumably became familiar with PCA's business during her tenure with the company. Willis may be able to utilize PCA's assets more effectively than different, but similar, assets potentially obtainable in the market. Therefore, PCA's collection of assets may have special value. Further, PCA apparently has exclusive franchise rights in Blacksburg, Virginia. The Complaint alleges that PIPC was to take over the Blacksburg operations of PCA after the Asset Sale, and by their very nature, exclusive rights cannot be obtained from another source.

Plaintiffs may ultimately face issues of proof in obtaining specific performance. In addition to establishing that the remedy at law is inadequate, Plaintiffs will need to show that the Asset Sale agreement is clear and definite and that Willis has substantially fulfilled, or is ready, willing, and able to fulfill, her contractual obligations. Defendants question whether Plaintiffs are able to meet their burdens. However, the question of whether the Complaint adequately supports the Court's subject matter jurisdiction should not be confused with whether an equitable remedy is ultimately awarded on the merits. Taking all factual allegations in the Complaint as true, Plaintiffs may be entitled to specific

performance if successful on the merits. The fact that specific performance may ultimately be unwarranted does not change this finding.[18] Once the Court determines equitable relief is appropriate, the Court has the power to decide legal aspects of a claim even if the Court ultimately determines that equitable relief cannot be granted.[19]

B. *Other Bases for Equitable Subject Matter Jurisdiction*

Under the equitable "clean-up" doctrine, it is common for the Court to hear cases that include legal claims in addition to equitable ones. "[I]f a controversy is vested with 'equitable features' which would support Chancery jurisdiction of at least a part of the controversy, then the Chancellor has discretion to resolve the remaining portions of the controversy as well."[20] Some reasons that may persuade the Court to exercise jurisdiction over portions of a controversy for which there is an adequate remedy at law are "to resolve a factual issue which must be

---

[18] *Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 502 (Del. 1982); *see also* Wolfe & Pittenger, § 2.03[b][2], at 2-59.

[19] *Prestancia Mgmt. Gp.*, 2005 WL 1364616, at *3 (quoting *Beal Bank SSB v. Lucks*, 2000 WL 710194, at *2 (Del. Ch. May 23, 2000)).

[20] *Getty Ref. & Mktg. Co. v. Park Oil, Inc.*, 385 A.2d 147, 149 (Del. Ch. 1978), *aff'd*, 407 A.2d 533 (Del. 1979).

determined in the proceedings; to avoid multiplicity of suits; to promote judicial efficiency; to do full justice; to avoid great expense; to afford complete relief in one action; and to overcome insufficient modes of procedure at law."[21]  When the facts involved in the equitable and legal counts are the same or interrelated, the Court is inclined to exercise jurisdiction over the entire controversy.[22]  Given that all of Plaintiffs' claims arise from the same set of relevant facts and involve the same parties, the Court exercises its discretion to retain jurisdiction over all claims.[23]

## IV.  MOTION TO STAY

Defendants argue that even if the Court has subject matter jurisdiction over Plaintiffs' claims, the Court should stay these proceedings pending the outcome of the lawsuit that Kaeding and PCA filed against Willis in Virginia on October 10, 2013.  The parties agree that *McWane Cast Iron Pipe Corp. v. McDowell-Wellman*

---

[21] *Id.* at 150.

[22] *Id.*

[23] The Court does not have power to award punitive damages in the absence of an express statutory provision.  *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at \*28 n.318 (Del. Ch. Jan. 29, 2010) (quoting *Beals v. Washington Int'l, Inc.*, 386 A.2d 1156, 1158 (Del. Ch. 1978)). Therefore, the Court cannot entertain Plaintiffs' requests for punitive damages.

*Engineering Co.*[24] controls the question of whether the Court should stay these proceedings.

The Court will not stay an action as a matter of right solely because a prior action is pending in another jurisdiction involving the same parties and issues.[25] However, in certain circumstances, the Court is moved by "considerations of comity and the necessities of an orderly and efficient administration of justice," to freely exercise its discretion in favor of a stay.[26] A stay is favored when (i) there is a prior action pending in another jurisdiction, (ii) that action involves similar parties and issues, and (iii) the foreign court can render prompt and complete justice.[27] *McWane*'s first-filed rule recognizes that "litigation should be confined to the forum in which it is first commenced, and a defendant should not be permitted to defeat the plaintiff's choice of forum in a pending suit by commencing litigation involving the same cause of action in another jurisdiction of its own

---

[24] 263 A.2d 281 (Del. 1970).

[25] *McWane*, 263 A.2d at 283.

[26] *Id.*

[27] *Xpress Mgmt., Inc. v. Hot Wings Int'l, Inc.*, 2007 WL 1660741, at *4 (Del. Ch. May 30, 2007).

choosing."[28]  Because the *McWane* factors are satisfied and there is no compelling

argument to overcome the attendant presumption to stay, this action will be stayed

pending the Virginia proceedings.

A. *The Virginia Action Was Filed First*

Plaintiffs filed the Complaint with this Court within a week after Defendants

filed suit against Willis in Virginia.  When actions are filed within a very narrow

time frame, the Court will sometimes consider the actions to have been filed

contemporaneously.[29]  "[T]he *McWane* doctrine does not denude a trial court of all

discretion simply based on the fact that one party won a filing race in a photo-

finish."[30]

While "the *McWane* 'first-filed' analysis is not applied mechanistically or as

a 'bright-line' rule," an action filed shortly before another may deserve "first-filed"

deference so long as there are no "special circumstances" urging the Court to treat

---

[28] *McWane*, 263 A.2d at 283.
[29] *In re IBP, Inc.*, 2001 WL 406292, at *7 (Del. Ch. Apr. 18, 2001).
[30] *Id.*

the actions as contemporaneous.[31] Special circumstances may exist when a second action is filed independently of, and very shortly after, another action that was technically filed first.[32] In such a case, both parties engage in independent decision making and a race to the courthouse results in a second filing made shortly after the first.[33]

"*McWane* most clearly applies when an individual plaintiff sues a defendant in a convenient forum and is then met with a responsive suit by the defendant in another forum."[34] When actions are filed at about the same time, as they were here, it is difficult to ascertain whether the second complaint was filed by someone who reacted to the first complaint or whether the filer of the second complaint simply lost the race to the courthouse. In the circumstances of this case, the first-

---

[31] *Dura Pharm., Inc. v. Scandipharm, Inc.*, 713 A.2d 925, 928-29 (Del. Ch. 1998) (finding that since both parties had been free to file suit for weeks and this was not a case of a "'race to the courthouse' following the expiration of a standstill agreement," the fact that the two complaints were filed within one business day of each other did not prevent the first from being considered "first-filed").

[32] *Id.* at 928 (discussing the facts in *Tex. Instruments Inc. v. Cyrix Corp.*, 1994 WL 96983 (Del. Ch. March 22, 1994), that led the Court to refuse to consider a Delaware action as "first-filed" where it was filed only five hours before an action in another forum).

[33] *Id.*

[34] *In re Topps Co. S'holders Litig.*, 924 A.2d 951, 956 (Del. Ch. 2007).

filed status is entitled to some weight, but it perhaps would be more significant if the other pertinent factors collectively provided little guidance.[35]

B. *The Delaware and Virginia Actions Involve Similar Parties and Issues*

The second consideration of the *McWane* analysis is whether the same parties and issues are involved in the two actions. In most cases, competing litigations do not involve exactly identical parties and issues.[36] In these situations, the Court "balance[s] the lack of complete identity of parties [and issues] against

---

[35] The Court's discretion is guided by balancing the *McWane* factors. Some precedent suggests that it is not prudent to give great weight to the fact that a foreign action was filed a day before a Delaware action when ruling on a motion to stay. *See id.* at 957. *In re Topps*, of course, was decided in the representative action context where *McWane* may be less important. For a consolidated shareholder class action suit, "[w]hat is most important is not that the filing plaintiff get her way, but that the stockholders she seeks to represent have their legitimate expectations upheld." *Id.* at 956. Other opinions conclude that actions filed in roughly the same time period should be considered contemporaneous. *See, e.g.*, *In Re Chambers Dev. Co., Inc. S'holders Litig.*, 1993 WL 179335, at *7 (Del. Ch. May 20, 1993). In any event, the circumstances of each case are relevant in deciding whether "first-filed" status is warranted. In this case, the Virginia action was technically filed first, and Plaintiffs have not argued either against its "first-filed" status or for treating the two actions as filed contemporaneously.
[36] *Choice Hotels Int'l, Inc. v. Columbus-Hunt Park DR. BNK Investors, LLC*, 2009 WL 3335332, at *7 (Del. Ch. Oct. 15, 2009).

the possibility of conflicting rulings which could come forth if both actions were allowed to proceed simultaneously."[37]

The issues in competing proceedings are sufficiently similar to support a stay under the *McWane* analysis when they arise out of a "common nucleus of operative facts."[38] There is no question that the Delaware and Virginia actions are related and arise from a common nucleus of facts. In the Virginia action, Kaeding and PCA charge Willis with wrongful conduct during her tenure at PCA, including interference with PCA's business, unauthorized acts, conversion of money and property, and breach of contract. In the action filed with this Court, Willis and PIPC paint a very different picture of the events leading up to her separation from PCA. The allegations in both actions involve the same parties, events, and conduct.

While the issues in the two actions clearly arise from the same common nucleus, the Court must also be satisfied that the actions involve sufficiently similar parties. Willis, Kaeding, and PCA are parties to both actions; however,

---

[37] *Id.* (quoting *Xpress Mgmt.*, 2007 WL 1660741, at *4).
[38] *Schnell v. Porta Sys. Corp.*, 1994 WL 148276, at *4 (Del. Ch. Apr. 12, 1994).

PIPC is not currently a defendant in Virginia. However, when the only party to a Delaware action that is not named in the foreign action is owned by a party to both actions, "[t]here is substantial or functional identity of all parties in both actions."[39] The Complaint alleges that Willis is the sole member of PIPC, thus satisfying the Court that the parties in both actions are substantially identical. Furthermore, Defendants have represented that they will not object to the addition of PIPC as a counterclaim-plaintiff in Virginia. The fact that PIPC could be joined in the Virginia action provides a further basis for a finding that the parties in the litigations are sufficiently similar to meet the *McWane* standard.[40]

Even when there is not identity among the various parties and issues in competing litigations, the Court must consider "whether allowing the cases to progress in tandem would either risk conflicting rulings or foster an 'unseemly race

---

[39] *Brookstone P'rs Acq. XVI, LLC v. Tanus*, 2012 WL 5868902, at *3 (Del. Ch. Nov. 20, 2012).

[40] *See id.* at *3 n.37 (citing Delaware plaintiff's ability, based on defendant's representations that it would not object, to assert counterclaims in a foreign jurisdiction against a party not yet joined in that jurisdiction as relevant to the *McWane* analysis).

to judgment' in each forum."[41]   The Court is also always concerned about the efficient administration of justice.  Allowing litigation to proceed in both Delaware and Virginia could potentially lead to conflicting rulings.  Through the Virginia complaint, Kaeding seeks a declaratory judgment that he is the sole stockholder, director, and officer of both PCA and PIPC, and that Willis has no ownership interest in either entity.  The court in Virginia has already decided against Willis on her *forum non conveniens* motion.  The fact that the Virginia litigation has gone forward advises the Court to stay these proceedings.

C. *The Virginia Court Can Render Complete and Prompt Justice*

The third *McWane* factor relevant to determining whether a stay is appropriate is the foreign court's ability to render prompt and complete justice.  Defendants have indicated that they would not object to the addition of PIPC as a counterclaim-plaintiff in Virginia.  There is no reason to doubt that the Virginia court can resolve the claims at issue.  Cases that fail to meet this *McWane* factor often deal with important or unsettled issues of Delaware law or the internal affairs

---

[41] *Xpress Mgmt.*, 2007 WL 1660741, at *5.

of Delaware corporations.[42]  In those cases, Delaware's strong interest in the subject matter of the litigation is relevant to the Court's determination of which forum is best suited to decide the claims.

Although this case does involve a Delaware limited liability company, it also involves a Virginia corporation.  Further, the core issues in the Complaint revolve around breach of contract claims and do not implicate important questions of Delaware corporate law or issues of internal corporate governance.  The controversy has many connections with Virginia, and there is no reason to believe that only this Court could render complete and prompt justice.

## V.  NON-CONTRACT CLAIMS

Defendants have also moved to dismiss Plaintiffs' non-contract claims, arguing that those claims are duplicative of the contract ones.  Given the Court's decision to stay the Delaware proceedings, the viability of the non-contract claims will not now be considered.

---

[42] *See* Wolfe & Pittenger, § 5.01[d], 5.28.

## VI.  CONCLUSION

This Court has subject matter jurisdiction over Plaintiffs' claims because of Plaintiffs' request for an equitable remedy, *i.e.*, an order for the specific performance of the Asset Sale.  The Court has the power to hear Plaintiffs' legal claims under the "clean-up" doctrine.  However, since a competing litigation is ongoing in Virginia, the Court will exercise its discretion to stay these proceedings based on its application of the *McWane* doctrine.  Accordingly, Defendants' Motion to Dismiss or, in the Alternative, to Stay is denied as to the Motion to Dismiss and granted as to the Motion to Stay.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ **John W. Noble***

JWN/cap
cc:  Basil C. Kollias, Esquire
     Darrell J. Baker, Esquire
     Register in Chancery-K